Good morning, your honors. May it please the court, Daniel Winnick for the government. I'll aspirationally reserve four minutes for rebuttal. There are three legal issues I'd like to focus on today. But before I get to that, let me start by recognizing that the plaintiffs here are facing significant challenges and VA believes it's vital to house as many veterans as possible, both in Los Angeles and around the country. And VA believes it's essential to use the West L.A. campus responsibly as a component of those efforts in Los Angeles. And there's real progress happening on the campus today. Among other things, the number of permanent supportive housing units has nearly doubled and I think later this week will more than have doubled since the time of trial. So the question in this case is not whether efforts to house homeless veterans are important. They clearly are. The question is whether the VA can follow its master plan for the campus and develop housing in the manner contemplated by that carefully designed plan or whether it has to upend the master plan and its broader housing strategy in Los Angeles to build housing in the particular type and quantity and location prescribed by Judge Carter. So the reasons we lay out in our briefs, we think Judge Carter erred in effectively taking over control of the campus from VA. The three issues I'd like to focus on today, subject of course to the court's questions, are the DJRA, the merits of the Rehab Act claims including the class treatment of some of those claims and the charitable trust claim. And as to both the VJRA and the Rehab Act Meaningful Access Claim, I think it's useful to start by just imagining a randomly selected member of the plaintiff's class, a homeless veteran in Los Angeles with serious mental illness or traumatic brain injury. And if I said, does that person have meaningful access to his VA health care benefits, you would not know the answer without knowing more information about the person. You'd need to know things like, are the health care services that that person needs available only on the campus or are they available at VA's various satellite locations in neighborhoods around Los Angeles? Where does the person live relative to the facility or facilities where he can get the care he needs? Does he have means of getting to the facilities? If it takes a long time, does he have any physical disabilities or other challenges that make that particularly difficult? I have a question for you. So under your broad interpretation of the VJRA, is jurisdiction precluded on any and all laws and statuses that touch on veterans' benefits? Well, so the language of the statute is necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans. So I think that's the answer is it covers determinations or any law that affects the provision of benefits. That certainly includes the Rehabilitation Act. That's clear from the history of the VJRA as recounted in VCS. The VJRA was enacted in response to the Supreme Court's decision in Treynor v. Turnage, which allowed federal jurisdiction over a claim that a VA regulation was inconsistent with the Rehabilitation Act. And how do we square that with the current precedent, which states that we must construe jurisdictional stripping statutes narrowly? So I don't think there's any question of jurisdiction stripping here because there is no question that there is going to be federal judicial review of a claim that a veteran needs housing or some other accommodation to access his benefits. The question is just does that review happen in the district court in the first instance or does it happen only through the specialized means of judicial review provided by the VJRA, first in the Veterans Court and then in the federal circuit? Let me make sure I understand. Your argument isn't that supportive housing is a benefit under Title 38, but instead it is a question that goes to whether or not benefits can be accessed? I think it's not so much our argument as their claim. The nature of their claim, as I understand it, and this is how the district court characterized it and the district court in Valentini characterized it, is that supportive housing is an accommodation that is necessary for veterans to access their health care benefits. So I agree. Supportive housing is not a benefit in and of itself. Their claim, I think, is that you need housing as an accommodation in order to be able to access your veterans' benefits, and that's exactly why a claim for this type of accommodation or any other accommodation to access a health care benefit properly proceeds through the VA benefits process. A veteran bringing a claim like that is claiming that he's entitled to a benefit that he's not able to receive. He's not receiving as the law requires. And so the proper means of pursuing that claim, like any other benefits claim, is to start with the agency, to exhaust it for the agency, go to the Board of Veterans' Appeals if necessary, and then seek judicial review in the veterans' court and the federal circuit. It's not to come to district court in the first instance. That's what the Valentini district court recognized after this courts on bank decision in Veterans for Common Sense because exactly as was true of the delay-related claims in that case, it's not possible to decide whether a veteran needs an accommodation to access his benefits without looking at the VA's provision of benefits to that veteran. So I guess I'm just speaking for myself right now because we don't conference before, but I'm not really persuaded by your argument on that point. I'm going to tell you on that, but I'm going to tell you where. And also when I look at historically from when it came in the first place, that it's really hard to say that the VA has done a good job. It's pretty difficult. And even after Valentini, not much happened. And when I look at some of the leases, I'm wondering how they benefited the veterans as far as that goes. So where my concerns come in are, well, I guess I'm tipping my hand a little bit. I mean, obviously I could be persuaded. But when I start getting into the Olmstead claims, do you concede that any of them, if you lose on – if you get over the saying that we're not stripped of jurisdiction here and that the class is okay, if you get to the claims, do you concede that any of those claims have any merit? No. Obviously I disagree with the premises, but I'll take them as a game for answering the question. I'm not saying that that represents the panel or whatever, that I couldn't change my mind. Of course, no. Even if the court had jurisdiction and even if the certification of the class were proper, we think all of the claims fail on the merits. And I'm happy to talk about any that the court wants to hear about. You asked, Your Honor, posited first the Olmstead claim. I mean, I read plaintiffs in their response brief virtually to have abandoned the theory that Olmstead requires the provision of housing here. In the one paragraph where they talk in response to our arguments about Olmstead, about why VA has a legal obligation to build housing, they sort of point to statements the VA has made about its moral obligation or its responsibility to build housing. They don't try to tie it to Olmstead, and it's for a very good reason. Olmstead is a case and a doctrine about ensuring that when government entities provide services to a population, that they don't create unnecessary segregation of disabled people or a serious risk of unnecessary segregation. So Olmstead itself, for example, you had people who were being warehoused when they could have been treated in the community, and the Supreme Court held that they needed to be treated in the community. There's nothing like that here. The district court's theory basically was that homelessness itself creates risks of hospitalization or jail stints, and therefore the district court thought the VA had to do everything sort of possible to prevent hospitalizations or jail stints among veterans because VA cares for veterans in certain ways. That's not what Olmstead means. But if you look at this historically, and so from when the original grant – and then I think there was an additional 300 acres, and somehow it turns out to be a pretty valuable property. And when you look at things that have occurred on this property, I struggle with how some of the things that the VA did benefited veterans at all, how when I look at one of the schools that they say they let them use the pool, but it was almost like there's like one minute in the day when you could actually get where that could work. UCLA I would put in a different category. I don't know how the drilling oil – I don't know how any of that benefited. But then when I get to the point, I guess Judge Carter basically said that he's going to run the VA now because you've done such a bad job, right? I think that's a fair characterization. And that doesn't – as an Article III judge, that is not – I think somewhere a long time ago, we decided we were going to run the prisons, and I don't know how that's worked out. So I guess the remedies here are what cause me concern, the reach of what Judge Carter – but then on the other hand, I don't think historically, when I look at everything here, I see why I don't think the VA has done a good job with the veterans. So what's a proper – what's proper other than running the VA? So I think there's a few questions there. Let me try to answer them all. I know. There's a lot there, but I'm just sort of telling you on a visceral level. And I appreciate it. Some of the things that – and I'm going to decide it legally. But – and I also, too, when I look at the charitable trust argument, because my understanding on the charitable trust, that's what applies to UCLA. And if there is no charitable trust, then that would vacate UCLA, right? Right. So to start with sort of the basic thrust of Your Honor's question. But what is this property for? It looks like – to me, it seemed pretty clear that it was for the benefit of the veterans. And there's a lot of things that have gone on throughout the years that there's been pushback that you were not doing things for the benefit of the veterans. So I don't disagree with that. And the VA has recognized it hasn't always lived up to its obligations in the past. Nobody's disputing that here. I'd make a couple of important points. One, the government is not here appealing on the land use issues. So we're not defending here on the merits, the UCLA lease, the Brentwood lease, the Bridgeton lease. That's not the premise of our appeal. Our appeal is that it was error for Judge – it was error for Judge Carter to rule against us on the Rehabilitation Act claims and on the charitable trust claim and that Judge Carter erred in ordering the construction of large quantities of housing. So even if you think that VA's historical management of the campus was not proper, even if for that matter you think that the three particular leases before you today were not valid, none of that is contested in our appeal. The premise of our appeal is there was no – the VJRA bar's jurisdiction, the class was improperly certified on the Rehabilitation Act claims seeking housing. Those claims all fail on the merits, and the charitable trust claim also fails on the merits. Tell me why that's true. I mean, the property surely seems that it was given for the benefit of the veterans. So I agree that that was the purpose for which the property was given. There are three different grounds on which the charitable trust claim fails. The cleanest one, the simplest path to resolving this claim, is that even if the plaintiff had standing to bring the claim, which is one problem with it, and even if the 1880 deed not only states a purpose of the gift but actually imposes a trust duty, which is the second problem, the duty isn't judicially enforceable. The trust duties aren't judicially enforceable against the government unless the government has unambiguously accepted them and provided for judicial enforcement, and there's just no basis for finding that requirement. Why doesn't the 2016 Leasing Act and the Master Plan constitute Congress' acceptance of fiduciary obligations that set forth in the 1888 deed? So there's two distinct questions. One is whether they accept fiduciary obligations, and the other is whether they provide for judicial enforcement. I don't think they do the first. I don't think they accept fiduciary obligations, but I think it's really clear that they don't do the second. There's not a word in the Leasing Act about judicial enforcement of any duties created by the Act, and quite to the contrary, the Act says about as much as you could say to make clear that Congress was envisioning political accountability for violations of the Leasing Act. That's why it provided for IG reports and investigations, for notifications to Congress before VA enters leases and so forth. Everything the Leasing Act says about accountability for the requirements the Act sets forth is political rather than judicial in nature. Again, in order to find judicial enforceability of trust obligations, you need a clear statement to that effect. So in 2 U.S.C. 159, which the district court noted in Valentini, I think you have an example of what a clear acceptance of judicial enforcement looks like. The statute there says the governmental entity may be, quote, may be sued in the United States District Court for the District of Columbia for the purpose of enforcing the provisions of any trust accepted by it. Didn't you renegotiate leases after the 2016 Leasing Act? There were some changes to leases after the Leasing Act, yes. So if we agree that the district court, that the land lease agreements violate the plaintiff's rights, what would be the appropriate remedy? Why doesn't the VA's failure to abide by the 2016 Leasing Act and the settlement in Valentini litigation support the issuance of a mandatory injunction? So if the court concludes that the leases are invalid, and again, of course, if the court concludes the leases, the three leases disputed here are invalid and these are not issues raised in the government's appeal, so if you think they're invalid, the court was wrong to go beyond holding the leases invalid and join us against entering into further leases. Correct, but more generally, all of that… Okay, the new leases, let's assume you have that authority, and it seems that you may, but since you didn't exercise it wisely in the past, why can't the district court impose something on you to say, you know, I want to take a look at the leases before you fully execute them? Because that would be well beyond the court's powers under the APA. I mean, for the same reason that when a court holds a rule invalid under the APA, it doesn't say to the agency, you have to bring any new rule on this subject for preclearance to me. The rule is that the agency tries again, and if somebody wants to challenge the new action under the APA, it can do so. Okay, so let's just assume, and I'm not saying this is that you did bad leases before, that you weren't looking for benefits to the veterans, but let's assume that you have the authority to do new leases, so then the remedy to that is then you get sued for those if you don't do a good job. That's right. Rather than having the district court in this instance oversee your ability to enter into new leases. Right. There's no authority for the district court to superintend on a going forward basis of the VA's entire sort of management of its land. And I would just note, and this is quite important, even if you disagreed with all of that, none of it provides a basis for the district court to order the construction of massive quantities of housing beyond what the master plan contemplates. And the district court did that only under the Rehabilitation Act claims, which again fail for numerous reasons. They're jurisdictionally barred by the VJRA. We think that's clear under Veterans for Common Sense. The certification of a class was improper because, as I laid out at the beginning, in order to know whether anybody has been deprived of meaningful access to his VA health care benefits, you have to know all sorts of facts specific to that person. And even if you got past both of those hurdles just on the merits, there is no basis in the record to reach the legal conclusion that VA deprived the plaintiff class of meaningful access to benefits, that VA created a serious risk of institutionalization under Olmstead, and therefore no basis for the court to impose the large housing obligation that it did. And that's even before getting to our defense under our fundamental alteration defense, which the district court barely considered. I see I'm cutting into my rebuttal time. I'm happy to answer further questions that the panel has. I want you to talk a little bit more about your fundamental alteration defense. How does constructing the extra housing on the campus alter the VA's program? So, you know, there was extensive testimony in the record from John Kuhn, who was the deputy medical director of the VA in Los Angeles, about how the VA's housing sort of vision, what it tries to do is create a diverse range of housing options for veterans of varying needs and preferences all over L.A., not just to create housing of one type in one place that people may not want. Have any studies been done as to whether the veterans want it? I don't know the answer to that question, but the relevant. Right now it appears that the options provided to the veterans is you're homeless or we'll provide you housing on the campus. So I guess my question is I get that the VA says, hey, we have the ultimate say. We're the ones who get to determine this. Has that question even been asked? I mean, is there any way for you to know? I know you're, you know, the government's telling us, look, district court couldn't do this. District court, you know, doesn't have the right or the jurisdictional authority to do it. They're speaking for us. They're standing in our shoes. I guess what I'm asking is what are you doing for the veterans? What are you doing to ensure that they do have housing, whether it's on the campus or not? It would be different if you came and said, Your Honor, we've done a study. They don't want to be on the campus. They prefer to be, I don't know, 20 miles away. Understood. And I don't have a study, but VA is making extensive efforts in L.A. as it is elsewhere to ensure that veterans, all veterans have a safe and stable place to be housed. So the efforts on the campus itself, as I noted, since the time of trial, the number of permanent supportive housing units has almost doubled from 233. So it was 233 at the time of trial. Right now I think it's 370-something, and by later this week or next week I expect it will be 497. There are about 3,000 homeless veterans in Los Angeles, so 497 is a pretty decent chunk. There is plans to construct the remaining housing envisioned by the master plan through about 2030. VA also makes extensive efforts to provide housing through the HUD-BASH program with HUD vouchers with VA supportive services. Those are also efforts the government is constantly endeavoring to improve. There have been recent changes, for example, that will have the effect of increasing the voucher amount in the local area. So VA is making lots of efforts. Those efforts are paying off from 2023 to 2024. The number of homeless veterans in Los Angeles declines by about a quarter. I am not here telling you everything the government is doing is perfect, and I'm certainly not saying everything that happened on the campus in the past is perfect, but the relevant question here is does VA get to continue the program it is trying to carry out, consistent with its resources and its legal authorities, or does the district court get to impose an ongoing superintendence of VA's operations on the campus? And we think the answer is clearly the former. All right. We've asked you a lot of questions, so I'll give you two minutes for a rebuttal. Thank you, Your Honor. Thank you. Good morning, Judge Callahan. Could I reserve 90 seconds for a rebuttal? Well, you can try. Your Honor, you were correct that UCLA's Ray Cardozo, representing the Regents of the University of California, and you are correct that UCLA's case is different from all the others because this 2016 West Los Angeles Leasing Act has a distinct provision applicable only to the regents that explicitly authorized the use of this land for baseball, knowing it was going to be used for baseball, based upon the other activities on the campus. So whereas all of the other leases are subject to a requirement that the lease itself must primarily benefit veterans, there's a different provision applicable to the regents that basically says you get to keep using it for baseball, you have to continue the vast amount of medical services you're providing to veterans under the medical affiliation agreement, and then you have to add in these in-kind pro bono services in the statutory languages in the extent and the manner that the Secretary deems appropriate. So we have a couple of issues with you. One is the district court didn't let you intervene, but you waited plenty of time before you did that. I don't have any idea what the reasons were, so we have to decide whether on that motion, but then let's say we, and then hypothetically, if we don't allow you, if you don't win on the intervention, then the next issue is we'll have to look at it, and if we think, because Judge Carter, my understanding is you grant summary judgment on the UCLA lease for avoiding it, right? No.  After a trial in which UCLA wasn't present and the claim was orally added in closing argument. You were given notice by the VA in January of 2024, correct? You're given notice that this — Is the answer to my question yes? Not notice of the claim that was orally added, which is the only claim made that the lease is illegal. So notice of the litigation was provided. Maybe you can explain how, in your view, your motion to intervene was timely given the delay. Sure, and I'll start with the oral amendment, which admits the claim wasn't pled, and UCLA is not present at this trial. Although, Your Honor, plaintiffs did not specifically name UCLA in the complaint, we now seek to amend the complaint to conform to the extensive proof. So there's an admission they haven't pleaded the claim. That's at ER 1191. But they do say conform to proof, and you — It's my understanding UCLA did respond to the subpoenas relating to your lease with the VA. So you were aware that there was some issue there. We know that they're criticizing the government's management of the property by the evidence involved at UCLA. There is no contention. This whole thing we briefed about the statutory provision where the lease is explicitly authorized, that claim was never made. And if you look at excerpts of Record 1577 and 1593, which is the pages of the operative pleading that plead the violation of the West Los Angeles Leasing Act, they explicitly reference only the provision that applies to the other leases, the primarily benefit veterans. They don't plead the UCLA lease. And most importantly, they don't plead the statutory provision I just talked about. So the statute that explicitly authorizes the lease is not pled the statutory provision. The contention that that lease is in violation of law and might be at risk isn't at issue in the case. So when UCLA subpoenaed to the trial, they think it's just to pile on more on the government on how it's managing. Importantly, they don't know its lease is at risk. They learn about this. The oral amendment was never followed up even by a written pleading, which the Nelson v. Adams Supreme Court says you absolutely have to do or it's a violation of constitutional due process when you do this oral amendment like this. You can't proceed against the new party unless you serve the written pleading and give them a chance to respond. UCLA learns about the fact that its lease is being voided. What's the standard of review for us as we're considering whether or not the district court fared in denial? The due process violation is de novo. No, the motion to intervene, the denial of the motion to intervene. It's abuse of discretion, but if wrong legal criteria apply, that's reviewed de novo. So I guess I'm not following how a wrong legal criteria was used. The district court considered the totality of circumstances that with respect to whether or not the intervention was timely, and it determined that it was not timely based on when UCLA was aware of its potential interest being compromised in this litigation, and it considered the prejudice of the other parties, the reason for the length of delay. I'm just really struggling to figure out how we can get to find that this was an abuse of discretion. Well, we did consider the most important thing, and the Supreme Court has directed as the most important thing. This oral amendment to conform to proof at 1191 is not mentioned in the order denying intervention. The fact that the claim was not pled, which is dispositive under Nelson v. Adams, is not mentioned in the motion to intervention. You cannot add a new claim that is not pled taking a statutory provision that isn't at issue in the case and using it to void a lease when the party is not present at the trial. You can't do that, and UCLA reads about this in the paper, and at the very next hearing, it is not even then ordered to appear. It's invited to appear. At the very next hearing, it, not the government, UCLA non-party is directly enjoined and blocked off, cordoned off from a long-term lease that Congress has explicitly authorized. It's evicted summarily without any process at all. That's an abuse of discretion under any standard. When you factor in the requirements of controlling law and the statutes of the district court, Rule 15, that's an application of erroneous legal criteria, and because the lease was voided and an injunction was entered against UCLA, UCLA has standing to appeal independent of intervention because it didn't just enjoin the government. It voided UCLA's leases. No one is saying you can't be here on appeal, but if you had been granted intervention at that time, what would it have changed? Number one, you just heard the government didn't defend, isn't defending this appeal. They did defend at trial. It did not bring up the provisions of the statute and how this lease easily, fully satisfies all those provisions. The bargain, the compensated provision of medical service, that is what lets UCLA use the provision for baseball along with these pro bono services. That was not mentioned in the trial. Okay, I'm just trying to rethink very concretely. Okay, let's just say that it was an abuse of discretion. I'm saying hypothetically. Then where does that put you at that point? Well, at that point, we've shown that the compensated medical services, which indisputably qualify and render this lease lawful, wasn't mentioned. Well, no. So if you should have been allowed to intervene, then that's an abuse of discretion, but then you're back in the district court, right? Yes and no. Well, I mean, there's no attempt in opposing this to show that if you applied the statute as it's written, you applied the actual statutory criteria on the statute that was never applied. Okay, well, let's say you lose on the motion to intervene, but then the next thing is you were ruled against based on a charitable trust. So is it my understanding that the other way you win is if we said there was no charitable trust and, therefore, your lease isn't voided? We don't uphold the voiding of your lease. The other way you win is the lease says there's an opportunity to cure. Well, it was a summary judgment, right? No, no, this was following a trial. And remember, in an ordinary – let's take a normal eviction. You can't evict someone without giving someone notice of the violation and an opportunity to cure. The lease says you have to do that. UCLA could easily cure because it could have just shown its lease was statutorily compliant. The thing that was skipped over at the trial in its absence, UCLA made that showing along with its motion to intervene. So I'm just trying to understand how you win and what is the effect of you winning. If we say there's no charitable trust and that was the basis for it, then we vacate that part of it. So that's how you win? It's over? One way you win. And your lease is up in 2026? Correct. So we don't – is that what you're just asking us to do? We don't do anything else? I'm asking you to give back this lease that was lawful and congressionally authorized, and there's several ways. One is the charitable trust way. The other is you have to have some process between violation and voiding of the lease. The tenant always gets an opportunity. That was never afforded. UCLA tried to avail itself of that opportunity. That's what I'm saying, though. If we say there wasn't a basis to void the lease, then that part of the judgment is vacated. So then you have until 2026. Is that what – That's absolutely all we need. I just – I'm just making sure that that basis is not accepted. These other bases that we briefed are also accepted because, number one, Nelson V. Adams gave us an absolute right to appear once that oral claim was made. Okay. If you – if we have no more questions, you're over. I'll give you 90 seconds for a rebuttal. Good morning. Good morning, Your Honor. May it please the court. Ernest Guadiana on behalf of Bridgeland Resources, and I'd like to try to reserve one minute for rebuttal. Okay. So since I have very limited time this morning, I'd like to focus on three points. First, I'd like to note how Bridgeland differs from the other appellants for two specific reasons, and then I'd like to explain why the district court's injunction permanently prohibiting Bridgeland from slant drilling even outside of the revocable license is overbroad and improper. So you've just heard from UCLA. I'd like to note that Bridgeland's revocable license under the Leasing Act was issued under a separate section, one that does not have a predominant focus of veterans. Now, more importantly, different than every other appellant in this case, Bridgeland's revocable license does not grant it a single inch of surface space on the campus. Instead, all that it does is permit a subsurface pass-through right where Bridgeland can put a wellbore hundreds of feet below the surface to produce private oil outside of the VA's grounds. Now, for that right, Bridgeland gives a royalty, which an industry expert with over 40 years of experience said was the most generous he had ever seen in his career, and that royalty funds a transportation program to bring veterans to their medical appointments. Now, Bridgeland does occupy a drill site on the VA grounds, but that's not from the VA. That is granted to it through leases with the Bureau of Land Management, which are not in dispute in this case. But I do want to be clear. No matter what happens here today and in this case, whether the revocable license is upheld or not, Bridgeland's footprint on the VA campus will not change one inch. But what will happen is if the revocable license is terminated, then this generous revenue will go away, and we believe that is clearly not what the Leasing Act intended. In fact, plaintiffs even think that that is somewhat of an absurd result in the fact that they entered into a settlement agreement with Bridgeland, which the court did not approve. Now, I'd like to just take – I'd like to turn – That's after Valentini. Yes, that is after Valentini. Bridgeland's revocable license was entered into after the 2016 Leasing Act in 2017. Now, I'd like to turn to the injunction just very briefly. So even if this court agrees that the revocable license was void under the Leasing Act, which obviously we disagree with, then the correct result would have been to terminate the revocable license or even go further and say that the VA cannot enter into similar agreements on those exact same terms. But what the court did by prohibiting slant drilling in the future was go far beyond that. First off, slant drilling was never an issue. It was never a claim that the plaintiffs sought relief from or anything like that. They wanted the revocable license terminated. But I guess the difference with that is that the district court, sua sponte, entered this injunction that no party had requested, which took away Bridgeland's rights to contract with other agencies and private parties, such as the Bureau of Land Management, who the plaintiffs even contend could give Bridgeland the right to slant drill. So the injunction was you can't slant drill anywhere? Correct, and permanently into the future. So what was the court's rationale on that? The court believed that it read a predominant purpose requirement into the Leasing Act, which I think it might have confused that with UCLA's standard for entering into leases. And it saw that the royalty was only 2.5% and said it has to be at least 51% because that's how it predominantly benefits veterans. But you have to understand, too, the Leasing Act grants the secretary of the VA the discretion to decide whether to enter into these leases. And the court viewed it as, well, are the veterans getting more or is Bridgeland getting more? And that's not the correct analysis. The correct analysis when the secretary is doing this is to see what are the veterans gaining by entering into this lease and what are they losing? And here they're gaining a substantial royalty for a transportation program, and they're giving up virtually nothing. They're giving up a subsurface pathway. For that reason, this injunction is overbroad, without jurisdiction, and should be set aside. And I'd like to reserve the rest of my time for rebuttal unless you have any other questions. Thank you. Good morning, Your Honors. My name is Eric Walter, and I'm joined with my colleague Skip Miller here on behalf of Brentwood School. I want to start, Your Honors, by confirming Brentwood School's unwavering desire to continue providing important services to veterans and their families. But for that to happen, Brentwood School needs a valid lease on the West L.A. campus. Given the voiding of Brentwood School's prior lease by the district court and the stay of the settlement approval process for the new lease that was negotiated with the plaintiffs, Brentwood School is now caught in the middle, without a lease, and with complete uncertainty on what is allowed under the West L.A. Leasing Act. And I do want to be clear that Brentwood School was fully committed to the settlement agreement it reached post-judgment with the plaintiffs, and if the settlement approval process had not been stayed and was finalized, we probably wouldn't be here. But because the stay was issued and the settlement agreement did not receive – The settlement agreement, is that post-Valentini? It is. It's post-judgment in this case. That's right, Your Honor. So given the fact that it has not received final approval and given the uncertainty with the appeal, Brentwood School really had no choice but to continue its appeal of the final judgment. What do you call that? It's prophylactic appeal. Okay. And I do think we – I mean, we had issues with the final judgment. I think there was an error on a narrow issue of statutory construction in the final judgment. It is our position that our prior lease complied with the plain language of the settlement agreement and the statute, certainly based on – And when will you know if that's approved? So it did receive preliminary approval by the district court. By Judge Carter? That's correct, yes. It was set for a fairness hearing, and then the administrative stay was imposed, and then the longer stay pending appeal was imposed. Okay. So given the reality of the stay proceeding, we are now continuing with our argument that a narrow issue of contract interpretation results in Judge Carter's decision in voiding our lease was invalid. And I know I'm not getting low on time here. I'd like to say that we believe that our lease complied with the plain language of the Leasing Act, and to the extent the Leasing Act is ambiguous, I believe the legislative history confirms that Congress was enthusiastic about the lease with Brentwood School that was envisioned in the VA Secretary's master plan. Resolving this issue will give the parties clarity and certainty on what's allowed under the Leasing Act, both with existing leases and with future leases, and including the lease that was negotiated with the plaintiffs. I'm not really understanding your argument that the plain language is ambiguous. I'm looking at it, and it seems pretty unambiguous that a lease to a third party, any lease of real property for a term not to exceed 50 years to a third party to provide services that principally benefit veterans and their families and that are limited to one or more of the following purposes. That seems pretty clear to me. What I'm not understanding is your argument with respect to the services that are provided that principally benefit veterans. Is it your argument that if one service out of all of the services provided benefit veterans, that's all that needs to be satisfied to comport with the statutory language? I think there may be a couple questions in there that I want to unpack. Principally benefit veterans and their families, it's our position it modifies the word services. So the services need a principally benefit. Principally benefit is a defined term in the statute. It's services that are offered exclusively to veterans and their families or services that are designed to benefit veterans as opposed to the general public. Let's say I agree with you that principally benefits modifies services as opposed to the lease, although I think it's a distinction without a difference. How still are you able to satisfy that mandate? Yeah, so you raised kind of a slippery slope argument. If a lease only provided some minor benefit to veterans, would it still comply? I think the Leasing Act does have a built-in protection, several built-in protections to avoid leases like that. Section G, subsection G, requires any leases that are entered into that they must comply with the master plan of the VA. Well, you must be offering more in the settlement than you were offering before, or I don't think Judge Carter would have approved it. Just hypothetically. That's right, Your Honor. Again, Brentwood School is fully committed. It does offer more services, I think more money. And it's an interesting point, right, because Judge Carter found that the prior lease was invalid and his interpretation of the statute was that it would be virtually impossible for Brentwood School to have a lease that could comply. Obviously, we negotiated basically structurally a similar lease but with more services provided, and it received preliminary approval from Judge Carter. All right. Thank you. Yep. Thank you. All right. We're ready for the appellees, I think. I didn't want to surprise you, but did I finish with the appellant? Okay. I don't want to cut anyone off at any time. Okay. Go ahead. Good morning, Your Honors. I'm Mark Rosenbaum on behalf of appellees. I'm sharing the argument with Mr. Preeb. Mr. Preeb is going to deal with the issues of the charitable trust and the scope of relief with respect to the land use agreement. How much time are you taking? I'm going to take 25 and leave Mr. Preeb 15. Okay. All right. May it please the Court. Let me start, Your Honor. Let me pay the issues I plan to address, and obviously I'm pleased to address any issue you'd like. I want to address, Judge Callahan, your point regarding the scope of the relief. I want to start right there. I then want to talk about the Olmstead matter that Your Honor raised. I want to very briefly go to your point, Judge Alba, regarding jurisdiction. I get the point, but I just want to add something quickly with respect to that. Then I want to talk about the UCLA matter, and I have a sentence on the Bridgeland matter. Can I just ask one quick question because I don't know if this is on the plate or not? Do you oppose dismissing HUD from this litigation? Yes. Dismiss HUD with respect to certain issues, but not with respect to the HUD-VASH system, which they're in charge of operating, and that is part of this case. I do plan to talk about that. Let me start, Your Honor, with respect to the statement that the Court made concerning the scope of what the judge actually did. Let's go to the order. I want to specifically look at paragraph 251 and section C, E, and H. Here's what the judge actually ordered. It isn't, as my friend, in fact, represented. At C, what the Court said was federal defendants are enjoined from failing to provide plaintiffs in the class they represent with appropriate permanent supportive housing on or near the grounds so that they reasonably can access the health care benefits for which they are eligible in the most integrated setting appropriate to their needs. This includes providing access to transportation to the grounds. That's a negative injunction, as Your Honor well knows, nothing in terms of operating the system itself. E and H are really the critical points because E and H are consistent with the way the judge addressed this matter, and he addressed this matter with a set of orders that were flexible and the call for a collaborative process with the government and the other parties. So what E says is within six months of the Court's order, federal defendants in consultation with the Plaintiffs' Council and the court-appointed monitor shall develop a plan for the construction of an additional 1,800 units of permanent supportive housing to address veteran homelessness within the catchment area. This plan shall include a timeline such that those 1,800 units shall be built and operated within six years, a six-year plan. Then H says as to both the temporary and permanent supportive housing, the Court retains jurisdiction to adjust the number of units in each category in order to closely approximate the actual need for housing. What does that mean? It means that the judge has not ordered a single unit of construction of permanent supportive housing on those grounds until we have a plan and until we see whether or not it's actually needed itself. That is a far cry from saying that those units are to be built as part of this order. What he's saying is let's be sensitive, let's be collaborative, let's see what the actual operation is. When does the 1,800 get pulled out of it? Oh, good question. It kind of came out of thin air. The numbers are in there, Your Honor, but I understand with respect to the record it's a little bit complicated to determine. Here's the critical number, which is nowhere mentioned in any of their briefs. The critical number is 379. What the Court found after a month-long trial is that there are only 379 available units on or near the grounds for purposes of permanent supportive housing for what is in fact an urgent need for that housing itself. On the grounds itself, the Court found that there were no available units with respect to that, and that came from the testimony of their own witnesses. Then the Court looked at the overall population and looked at the individuals, as Your Honor referenced earlier, who are in housing units. Your Honor said, I think, 20 miles or 6 miles. That's degenerate. The Paso Robles, the Templeton, is over 200 miles from the tertiary center, which is necessary for these individuals who are suffering brain trauma, who are suffering severe mental illness, who are suffering from PTSD. 100% disabled. This is the only place where they can get what they need, and that is tertiary specialized. What the judge did was he said, look, let's look at the overall population, which we talked about earlier, and then let's also look at the number of individuals who are far outside any reasonable radius, 5-mile radius, to that medical unit. Then he said, I will use the government's estimate as the percent of individuals with TBI or SBI, which is 24%, which quite frankly is ridiculous. Their own testimony, as the judge recognized, was much closer to 70%. Indeed, Your Honor will recall that the draft master plan specifically targeted TBI and SMI as prime individuals, and the government's own numbers was that those percentages were in the neighborhood of 60, 70, even above 70%. But he took the smallest number, and that's where that number came from. But again, I want to emphasize that that number is not locked into stone. We're going to see what the actual need is. And over a six-year period of time, we'll see what the actual need itself is. One other matter with respect to this. If we leave everything in place, hypothetically, that Judge Carter did, what's Judge Carter going to be doing for the next six years? Well, my guess is he'll be busy. But what he will be doing is superintending. So with respect to the construction, he'll say, let's see what that plan looks like. Let's see what the actual need is. That bothers me that he's running the VA. He didn't say he would do it himself. He said he would do it in collaboration with the government, in collaboration with the plaintiffs, and with a monitor to look at it. Okay, but in collaboration, but is he the final say in that? He has the final say because the jurisdiction does have the jurisdiction. But Your Honor really hit the principal point with respect to that, and that is there is a history here of the government not serving the veterans, either based on the deed, based on the commitment on the draft master plan, and quite frankly, based on the commitment that they made to veterans who served this country and who came back with the invisible wounds of war or who were sexually assaulted by their commanding officers or their drill sergeants or they were booted out because they were gay. There is a record here. There is a record that goes back to 2011 in terms of the government not doing close. If you take a look at the number of units, it's like 26 units a year. The testimony was they put up more units in a week in Iraq than they did here. And these are individuals who suffered, who were at Fallujah and who were at Ramat. I have a question for you. I want you to narrow down why we're not stripped of jurisdiction under the VJRA. Great question. The first point is the point that Your Honor made, and that is you look at cases like Axon from the Supreme Court, Arce from this court, and it says when we look at jurisdictions, we read them very narrowly. But I'm so pleased that Your Honor raised it because this court's decision in VCS, the Browdy decision, the Camacho decision, tells us the test to apply. In VCS, which everybody agrees is a seminal case in this situation, the court looked at three sets of claims, two with respect to delays, one a Matthew V. Eldridge claim as to the way that the benefits were being dealt, should there be discoveries, should there be subpoenas, should there be a pre-decision hearing. And the court said, this court said at page 1034, two things. One, with respect to that Matthew V. Eldridge claim, we don't have to revisit any sorts of determinations. That's exactly the situation here. No one questioned, no one cross-examined these veterans as to the determinations because those determinations were made. Secondly, with respect to the test, the test that was laid out at 1034 was specifically, was this sufficiently independent? Were those claims sufficiently independent of the benefit claims? The Browdy case said at page 176, do the claims somehow, it can't be that they just somehow touch upon the benefits. It's got to be narrower than that. And the Camacho case at page 633 specifically said that we're not going to address, we cannot take cases that are brought under the Rehabilitation Act. What is the Rehabilitation Act? It's a nondiscrimination claim. It doesn't deal with benefits. That's 38 U.S.C. If you go through 38 U.S.C. or 38 CFR 20.3, you're not going to find anything about permanent supportive housing. You're going to find death benefits, loans, disability compensation, education, pensions, but nothing to deal with this. This notion, Your Honor, that somehow this swept out everything, not only violates AXON and our state, but it violates common sense. They're saying if an individual went to the wheelchair ramp, they couldn't bring a lawsuit to do it even after they've been fully determined. That's exactly what the situation is. And the Traynor case actually supports us with respect to that. Traynor was a case involving using your GI benefits for education within 10 years. And individuals came in Traynor and said we're alcoholics, we weren't able to do it. And the court adjudicated that issue. That's what led to 511A. What happened in 511A was that the language changed from 211. Look at the exact differences in the language. 511 adds to the process itself, the language, questions of law or fact necessary to determination. That's what triggered it in Traynor that you had to determine whether or not the alcoholism justified, in fact, granting benefits. That's not what's involved here. This is an entirely separate claim with respect to the benefits themselves. Let me ask you now, counsel, to pivot to the class certification question. Was there an issue there with the commonality? No. And, again, the case that they cite, the Walmart case, at page 350, sets out what the test is. The test is can you with a single stroke address what the overall issues are that are big race? Walmart, remember Justice Scalia said in the opening sentence of that decision, this is one of the most expansive class actions ever. One and a half million females brought that lawsuit. 3,400 stores, a kaleidoscope of superintendents. No, just those overall policy that was dealt with. This court in the Parsons case and the Armstrong case, which is cited twice in the Parsons case, said no, if you can get a single stroke, then you can qualify for it. Parsons was the case involving health care benefits. A whole variety of health care problems. What is your common question that we can answer and not have all individual cases? The single question here is whether or not this class of disabled veterans can get reasonable accommodations on or near the grounds so that they can access medical care, which is only operated on that tertiary and specialized campus, and otherwise not be put in a situation that creates an Olmstead problem. And that the judge dealt with with a single stroke saying get the system a reasonable accommodation, get the system a permanent supportive housing in order. I don't care if you do that through building housing on the ground. I don't care if you do it within a five-mile radius. They've now got a compensation process, a possibility to get loans. I don't care if you do that by improving the HUD-VASH system, which is a tragedy. It's a complete mess in terms of what it is. But that's a single question with a single stroke to answer those particular questions. Can I take 30 seconds on UCLA? UCLA misrepresents what they were told. They were told on January 31st of 2024, seven months before the trial, more than seven months before the trial, your land use agreement may be impacted by this litigation. Boy, how can you spell it out more clearly? How were they told that? I'm just asking how were they told that? They were told that by the government. The government sent them a formal notice of that. Bridgeland obviously responded by intervening in this particular case. And attached to that was an order. Then on April 1st, they were served with multiple discovery, always dealt with compliance. On April 24th, they were subpoenaed. On May 13th, I met with them with the number two person in the general counsel's office in a meet-and-confer. That's where it was discussed. In June, they were deposed. And I questioned Mr. DeFrancesco. This is what's so remarkable about this argument. They are attacking their own 30D6 witness who testified that the predominant focus, not, as he says. I'm sorry. I'm sorry. I'm sorry. I just have two more sentences. Testified that the predominant focus on those grounds was baseball.  And in fact, as your honor will recall from this record, during the height of the pandemic, when veterans pleaded to set up housing on a parking lot, UCLA and the VA said, no, we've got a baseball schedule to fulfill. Why was the APA claim not raised? Well, maybe I should get a malpractice action against me. But the reason was because we wanted to do the discovery first. We did the discovery. We wanted to bring the action logistically. What the court told us was that that may mean the case will get delayed, the trial will get delayed. And we just didn't feel like we could do that with the veterans. I will say that, you know. But is there some, okay, I think you're taking exception from what the representation that your friend on the other side is saying. But he also said that his lease was under a different section and a different category. But the language. No, but just let's break it down. Was that correct? No, because the language of the order that came to notice was it may be impacted. It didn't say how it would be impacted. Well, I know. But the other two, were they under a different statute than UCLA's? Yeah, and I think specifically I'm interested in hearing your remarks with respect to Bridgeland. It was not brought under the APA, the UCLA claim. I might say that, you know, if we have to, it's going to survive under. I think the question is now pivoting to Bridgeland. Yeah. If I'm understanding your question correctly. I have the same question. The lawyer for Bridgeland stood up here and argued that essentially their lease comes under a different section of the Leasing Act. It's not subject to the same analysis that essentially there's agreement with the plaintiffs that they ought not be in this litigation. And I'm interested in your. That's completely wrong for two reasons. First of all, the OIG twice, as was required by Congress, looked at the Bridgeland revocable license and found it to be illegal under the West L.A. Leasing Act of 2016. Well, but how can the judge say they can never do slant drilling anywhere? Didn't the judge say that? No, what the judge said. Well, and furthermore, I'm going to tell you, you can't do what you're doing in this lawsuit, but then you can't do anything wrong for the rest of your life. And I'm going to. No, the judge modified the order to say with respect to the Sawtill 2 well, which is on that land, which is the subject of that revocable license, that that, in fact, could not go forward at this time. And the reason he did that was just because the oil is being taken out and those benefits ought to go to the veterans under what is at least that it's compliant. At 247B, all the court said was federal defendants' agreement with Bridgeland Resources does not principally benefit benefits in their families and thus constitutes a breach of their fiduciary. That's all the judge said. They're concerned about matters that, in fact, the judge did not rule on, but that's the only time Bridgeland is mentioned in the order. That said that lease was illegal. It was illegal. My God, 2.5% go to the vets and 97.5% go to the- They're not taking any of the land on the top. No, but they're using that land. It's still- Can you build housing on top of the land? No, because of what they did to that land. But what you can do with that land is move other properties to that area and build housing somewhere else. That is the VA's position is we don't have space. The court specifically found after tons of testimony that that wasn't true. Because of the contamination there, there are issues with respect to that, but that doesn't preclude using that land. That land isn't for oil and oil only. I mean, my God, that would be an absolute acclamation of what Your Honor said several minutes ago with respect to how the VA dealt with the situation. No, tragically, housing can't be built there. It's about two-plus acres with respect to that land. But you could take other uses that happen elsewhere on the 380 acres, move that there, and that would free up space. But the basic point is that the Leasing Act is really clear, and with respect to Bridgeland and Brentwood, that land use agreement must principally benefit veterans and their families, and it doesn't do that. It principally benefits veterans and their families based on the royalties that are paid, which I think is the argument that your friend on the other side is making, that when weighing the benefit of the royalties that are paid versus the loss of the land in which the slant drilling is occurring, one clearly is greater than the other. There's two problems with that, Your Honor. First of all, with respect to that, the breakdown is 2.5 percent go to veterans. Everything else goes to either Bridgeland or the people who are getting benefits, the growth revenues of the land. That's the breakdown, 97.5 versus 2.5. That clearly doesn't principally benefit them. Secondly, the OIG found, and the court agreed with that, that you can't use money as your source for principal benefit, and that's really what they're doing. They're taking the money, and then they're using it as a pass-through for that transportation. They're making it like it's a generous gift. My God, that land belongs to the veterans. It's to be principally used by the veterans, and on both those counts, that violates the statute. That's what OIG found, and that's precisely what the court found. Counsel, give me examples. You mentioned that, unfortunately, housing can't be placed on that land. What are you thinking could be placed on that land? Oh, there's all sorts of things, Your Honor. There's storage areas. I mean, it's a huge set of grounds, and there are storage areas that could be moved. There's already been discussions about the sort of things that could be moved there. And they're mutually exclusive? If you put the storage areas there, you couldn't also still allow slant drilling? I mean, does one impact the other, as in the floor is going to fall out from underneath it if you allow Bridgeland to continue slant drilling? I don't know the answer to that question, Your Honor, but I do know that the deal that presently exists doesn't principally benefit, and you don't have to be a math major to figure that out. 2.5% by definition. They say, well, it affects our profits. Well, that's not feasible. But your argument actually is a step before that, which is even if it was 97%, your view is that a monetary payment can't displace the requirement in the statute. It's a double-barreled argument, and you're right on both of those points, Your Honor, and that's what the OIG found as well. And assuming my co-counsel doesn't murder me, I'd like him to take the rest of my time that's available. You're yielding? No, I just want my co-counsel on the issue of charitable trust. Okay. So does he still have two separate blocks? There is a separate block. Is he in overtime or not? Okay. So you still have two minutes. What are you asking to do? I'm asking to give the remainder of my time to my co-counsel. Okay. So you want to give two minutes to Mr. Pree today?  I'm sorry. Okay. Thank you. Good morning, Your Honors, and may it please the Court. My name is Mark Pree, also on behalf of the plaintiffs, our FLEs. As Mr. Rosenbaum explained, I'm here to talk specifically about the charitable trust issues and happy to also touch on the remedies with land use injunctions as well and the leases. So I'll start with the charitable trust and specifically want to address two main issues there with that. The first is the existence of the trust, and the second is the enforceability of the trust, which my friend on the other side addressed briefly here this morning as well. So on the existence of the trust, that issue turns entirely on the 1888 deed, which, as we know, gifted the land to the VA. And the issue there is very straightforward. It is whether, based on the language of the 1888 deed, the donors, quote, manifested an intention to create a charitable trust. And what California courts mean by that is whether the donors, in giving the land to the government, impose some sort of obligation on the government in what to do with that land, whether they remove the exercise of discretion on what to do with the land when it was given. And that is exactly what the 1888 deed does here. It says that in consideration of the premises, the donors are giving the land to the government expressly for the purpose of establishing and maintaining and permanently establishing a home for disabled volunteer soldiers. That is an imperative obligation on the government, and therefore there is a charitable trust. The second issue I'd like to address here is the enforceability. So we agree, as the government mentioned this morning, that it's true that for the government to assume an enforceable fiduciary duty under a trust, it needs to do so by a statute, by a congressional statute. But as Your Honor mentioned this morning, well, all it does is just that. And the Supreme Court is clear on this issue. There are two requirements that need to be met in a statute for that statute, for the government to assume enforceable fiduciary duties under it. The first is that the statute imposes some sort of obligation or prescriptions on the government of how to manage a trust. And that's exactly what Walala does. The Leasing Act is filled with those types of prescriptions. It requires when the VA enters into leases, those leases are to principally benefit veterans and their families. That's Section 2B. When the VA collects revenue from those leases, that revenue needs to go directly to the campus or the grounds. And Section 2D contemplates that the VA is going to implement the draft master plan. That's contemplated in Section 2I. So these are statutory prescriptions on the VA's responsibility with the land. Can we take a step back and talk about the standing the plaintiffs have with respect to the charitable trust claim? Sure. Do you agree that California law applies to this claim? Yes. We agree with that. California law applies. Okay. So why doesn't the Attorney General have exclusive standing to enforce this claim? Typically, the State Attorney General is the party responsible for enforcing the claim. But California courts, and in the cases that we flagged in our brief, basically every jurisdiction that has addressed this follows the restatement on this issue, which recognizes the special interest exception. So what that means in so many words is that the beneficiaries that are contemplated under a trust have a clear interest in the enforcement of that trust, and there are circumstances where those beneficiaries may sue to enforce the trust, separate from the Attorney General, which is what we have here with the beneficiaries and the plaintiffs at issue. So if we were to determine that the plaintiff's charitable trust claim fails, either because it's not a charitable trust or they don't have standing, and accordingly vacate the injunction against the UCLA lease, should we nonetheless consider whether UCLA lease complies with the 2016 Leasing Act? Does compliance raise tribal issues of fact that would be necessary on remand? If the question of UCLA's lease complying with the 2016 Leasing Act is remanded, do you agree that UCLA would be a party to the remand? I know that's a lot of questions, but they're all UCLA questions.  So as has been discussed, under an unfortunate situation, UCLA is not part of the APA. So were you to disagree with us on the charitable trust claim, UCLA would not be part of the APA claim, but we still think that they would be in clear violation of the Leasing Act. But do we have to address that, or are we just done at that point? On the posture that's before this court, you would not have to address that, Your Honor. Okay. So in addition, I want to get back to one of the government's points. Okay, but if we say we agree with you, then we do have to address it. On the charitable trust claim, correct. Yes. But even, okay, if we do have to address it, it seems like there's tribal issues there. So it would go back, and then they would be a party to the lawsuit then, right, if we remanded that. If I'm understanding your question, Your Honor, is this assuming that we would lose on the charitable trust claim? Under the charitable trust claim, whether UCLA's lease is in violation of the Leasing Act is squarely at issue in the charitable trust claim. Right, but if you win on the charitable trust claim and you have standing on that, then we have to address it, correct, the 2016 lease with UCLA? Yes, correct. That's correct, Your Honor. Okay, but if we don't feel that we can on this record? The record is full with, I mean, as Mr. Rosenbaum explained, they produced the 30B6 deposition. They produced discovery in this matter as well. So all that is in the record and has been discussed in the briefs as well. And, again, before this court, that issue is squarely at play under the charitable trust claim. Okay. I'd like to get back, as I was mentioning, on the government's point of the enforceability of the trust. The government's main thesis here, as was described this morning, is that the Leasing Act needs to literally say that the government assumes enforceable fiduciary duties or that it may be sued. I believe the government gave an example from another statute. But that's just not true under Supreme Court precedent. The Supreme Court has addressed this multiple times, most notably in the case of United States v. Mitchell, which involves a very similar issue as what we're having here. Congresswoman? I'm just thinking of this, and I'm sorry to interrupt your train here. But Judge Carter said that the VA can't even engage in leasing agreements. I believe Judge Carter said that the leases that the VA has been entering into, based on what the parties have been doing, it's not possible for those leases to principally benefit veterans and their families. Well, but I think didn't Judge Carter go further and say they can't negotiate any new leases? Isn't he bringing that under his superintendency of the VA? That's correct. So he would be reviewing those leases? That seems broad to me. What Judge Carter stated was that he did issue forward-looking relief under his equitable power, preventing the VA from entering into future land-use agreements with the four third parties here. And there's plenty of record sites supporting the district court's claim there. What the district court was doing was essentially – But how can they do business if they can't even lease? So they just have to come to the court and get the permission of Judge Carter? Is that what the injunction is requiring? I think what the injunction is requiring is – I mean, we have to keep in mind exactly why the district court issued that equitable relief. This is decades of mismanagement and leasing. I understand why. I mean, and I said that right out the gate. They haven't done a good job. They haven't – they've failed on many counts. But then the other thing is we can only give the power that someone – that Article III would entitle them to. We can't say, well, what if he said, I want to be God now, and I'm going to make all – that we couldn't – we have to look at the breadth of the injunction. So Judge Carter's authority under its equitable relief is whether – taking into account those past wrongs, whether there would be a real and immediate threat of future harm to the plaintiffs. And what he did in looking at the record was when he let the VA free to renegotiate these leases, the VA continually, even despite its own secretary, its own OIG's findings, that their leases were noncompliant with WLALA, continued to extend these leases. This happened specifically with Bridgeland and Safety Park. This is Paragraph 110 of the district court's findings of fact. It did so also with Brentwood and UCLA. This is after the district court in Valentini voided the leases. The VA subsequently reentered into what the district court here found were nearly identical leases. I don't really disagree with you on any of the reasons that just because they say they're going to do a better job, that that makes everyone comfortable. But I like to think about what the Supreme Court would do when they look at things. And you probably – you're an intelligent man, and you know that in the courts the breadth of injunctions is something that's being litigated and is going to end up at the Supreme Court. So if, hypothetically, we were to uphold this injunction, what would the Supreme Court say? I always think that too. I mean, I don't get up every day and say I want to be reversed by the Supreme Court. But on the other hand, you know, I mean, and I want to stay Article III. I like to color within the lines. And my concern is that this is possibly coloring outside the lines and it's too broad. So that's what I'm trying to get my arms around. I think what the district court is working with here is a series of facts that support its main finding at the end of its opinion, that due to the VA's persistent mismanagement of it, it's not possible for the VA to enter into lawful agreements with these parties that would principally benefit veterans and their families. Let me ask sort of a variation of the question that Judge Callahan just asked, which is, is there a different way to achieve, I think, what you are indicating is the stated purpose or goal, the justifications behind Judge Carter's injunction, without having this black and white, you know, prohibition against bridgeland plant drilling ever, never having or, you know, vacating the lease with Brentwood. Is there a way to achieve those goals, assuming we agree that judgment is appropriate in favor of plaintiffs on APA claims, that doesn't create some of these concerns with respect to the injunction? And if there is, then what do we need to do in our disposition to indicate that the purpose might be okay, but the sort of specific micromanagement or, you know, complete prohibition to some of this activity shouldn't be dictated by the district court? I think the answer to that question, Your Honor, kind of goes back to one of your earlier questions, which is what is compliant of the Leasing Act. You teased out a bit whether a lease, the underlying lease, needs to principally benefit veterans and their families, right? And so I think that the scope of Judge Carter's relief here is taking into account just how far the current leases are. I mean, we're debating whether 97.5% of royalties under the bridgeland one could be, you know, principally benefiting veterans and their families as a whole. That's so far removed from – So you would be fine with language in an injunction that said just that, without having to have these specific provisions ordering bridgeland to stop plant drilling in perpetuity? I don't think there is a scenario where bridgeland slant drilling on VA campus could ever principally benefit veterans and their families. Then why does it matter whether that specific language is included or not? If there's some broader language that says, I think, what you've just articulated before, which is that it needs to comply with the statutory language that principally benefits veterans and their families, isn't that enough? Sorry, I may be misunderstanding the question, Your Honor. My question is why – I think the tension here is that the specific scope and language of the injunction is incredibly far-reaching by stating something, for example, that bridgeland cannot slant drill on the property ever. And your view is that's true because it doesn't provide a benefit to veterans and their families. So couldn't the injunction simply state that the leases must comply with the statutory requirement that the services provided principally benefit veterans and their families without having to state expressly that they can never drill on the land? Wouldn't that be enough? Yes, I agree with that, Your Honor. I understand the question. I agree that if the VA's leases with third parties would be in compliance with WLALA, then that would be sufficient. So, yes, that's correct. I think what I was trying to tease out is the thrust of the district court skepticism that that's possible with these lessees. But to the extent that is possible, yes, if those leases are in compliance with WLALA, then that would be a permissible part of its injunction. So if he's running the VA, then he can decide what the royalties are too? I mean, because all of these parties are in a completely different situation about what they're doing and the facts of their individual cases. And that, I mean, has, let's say, since the, you know, drilling or whatever, getting the, you know, doing the oil situation isn't, it's not affecting what they can do on top of the land. So why does it have to be that they can't plant drill and that they have to pay 97%? Why they are getting, the veterans are getting some free money here for that and they can still use the land on the top, right? Well, there's a few questions there I'd like to unpack. I mean, the first part is we disagree respectfully that the district court is attempting to run the VA. As my co-counsel explained, these injunctions and the remedies it's issuing are in collaboration with the parties and meeting with both plaintiff's counsel, the VA, of how best to get these leases to comply with law to the extent possible. And on the second – So you collaborate, but if you get to be the ultimate decision maker, you're running it. It's just, it's a little bit like in universities. They have duty to have shared governance, but the president makes the decision or the board of trustees makes the decision. You know, I understand you get to make your arguments to us, but I get to decide along with these two judges. So he still is, he's still the king there or the superintendent. He does get to make the final decision, Your Honor, but I think that's because the VA has been incapable of making the decisions on its own for the last 50 years with this. And that is the thrust of the district court's injunctive relief. So I'd be happy to address any other questions on remedies or charitable trust. Otherwise, that's all. Thank you, Your Honor. All right, thank you. Rebuttal. Thank you, Your Honor. Four points. First, the order here is to build 1,800 units of housing on top of the 1,200 units provided by the master plan. That's 3,000 units of housing. There's currently about 3,000 homeless veterans in Los Angeles. So the order essentially is to build housing for every homeless veteran in Los Angeles. And within weeks of issuing that order, which gave us 12 to 18 months to develop 750 units of supportive housing, the judge was ordering us to build 100 units in a matter of weeks. So the idea that this is a modest or collaborative process that's going to wind up at a reasonable place is just not supported by the record. Second point, on the BJRA, the question under VCS is, does adjudicating the claim require the court to, quote, review the circumstances surrounding the VA's provision of benefits to individual veterans? The answer is the district court recognized in Valentini is clearly yes. Plaintiff's argument this morning seems to be that the Rehabilitation Act is not, quote, a law that affects the provision of benefits to veterans. That's the text of 511A. That's implausible on its face, and it's inconsistent with the history of the BJRA as recounted in VCS. Third point. Since you're an expert on this, hypothetically, let's assume that the VA isn't doing everything right. What would they have standing? How would they sue? As to the BJRA. So you're saying they don't have standing. So the BJRA issue is not a standing issue. As to the BJRA question, if they think, if a veteran thinks that he is being deprived on the basis of disability of a VA benefit to which he's entitled, the proper recourse is to go through the VA benefits process to make that claim to VA and to seek judicial review of a denial in the veterans court and in the federal circuit. So essentially exhausting the administrative remedies and do that as one person and not as a class. That's right, and that's what the BJRA requires. The court in VCS said essentially the same thing. The third point I'd like to make as to commonality. My friend this morning characterized the common issues at an incredibly high level of generality. Is there meaningful access? What's a reasonable accommodation? In some Rehab Act cases, those may be adjudicable on a common basis, but here, given the nature of the claim, they clearly can't be, because as I said at the outset of my argument this morning, if I ask you to picture a random member of the class and I say, does that person have meaningful access to his benefits, you can't possibly know the answer without knowing all sorts of details about the person, and you can't possibly know what accommodation might be reasonable without knowing all sorts of additional details. Okay, you need to wrap up. Yes, and my last point on the existence of a trust. My friend said this morning the donors had a purpose that the land be used for certain functions, and therefore there's a trust. The law is the opposite, as our briefs lay out, and as to judicial enforceability, I think I heard him relying on the Indian trust cases as sort of setting forth the general test of enforceability. That's not what those cases do. Those cases are construing statutes, the Indian Tucker Act and the Little Tucker Act, which provide for judicial enforcement of particular obligations in particular circumstances. The whole problem here is there's not a similar statute providing for judicial enforcement. Thank you, Your Honor. Thank you. Thank you, Your Honor. Running through the order of how the issues involving UCLA the court could reach, if you reverse on a charitable trust ground and UCLA gets its lease back, you don't need to reach any of the issues UCLA has raised. If you don't, you do have to look at the question of whether the record permits a finding that UCLA's lease violates not the erroneous provision that they pled, but the provision that applies to the regents. If you conclude, as you should, that this record does not support such a finding, you don't necessarily need to reach the motion for intervention. But if you do, Judge Desai, I just want to give you one record site on your abuse of discretion comment. On ER page 3, the district court says in the motion for intervention, the court found this duty was violated because the predominant focus off the lease was UCLA baseball program, not the provision of services to veterans. That, of course, is the wrong statutory provision. That's the principal benefit of the lease provision that applies to the other lease. The regents' provision is based on all of their activities on the campus, and that's the fundamental problem in this case. The only claim that was pleaded was the statutory provision that does not apply to the regents. That's how the case was tried in the regents' absence. And then after the regents learns and shows up and says, whoa, you've got the wrong statutory provision, our lease is explicitly authorized by Congress, the district court doesn't even let them intervene at that point. With a clear error of law, statutory misinterpretation, that is an abuse of discretion. We don't care which theory the court uses, but there cannot be a situation where a statute explicitly authorizes a long-term lease that continues the use of the property that's been in place for 50 years. Congress has specifically authorized the lease. I need you to wrap up. You can't void that lease based upon a trial where the tenant isn't present and the right statutory provision isn't invoked. Thank you. So I'd just like to address a couple of the points that were raised by plaintiffs. First, regarding the question about the section of the lease, UCLA's lease is issued under Section 2B3. Bridgeland's lease is Section 2B2. Those are different sections. Regarding the OIG report, the OIG determined that the revocable license was noncompliant because it was not, quote-unquote, veteran-focused. There's no such requirement in the Leasing Act. That was wrong, and it's for this court, not the OIG, to decide whether the revocable license is correct or not. Regarding the 97.5% going to Bridgeland, first off, a large portion of that actually goes to the private oil owners. Bridgeland obtains a royalty, and the record is clear at 3ER545 to 546, that when oil goes to around $60 to $65, the 2.5% royalty is more than what Bridgeland makes. That is more profit, and that's exactly where the oil prices are right now. So today, the 2.5% royalty is more profit on this well than what Bridgeland's obtaining. And lastly, regarding Mr. Rosenbaum's comments about the rights of Bridgeland to be on the property, I note that the two acres that he's talking about is what Bridgeland was willing to give up on its drill site that it has through the BLM. That two acres, it was going to give back to the VA so that it could be used for either housing or storage or something else. Bridgeland currently uses it for storage and was going to move its stuff off. It has rights to that land, but it was going to give that up, and Judge Carter would still not approve that settlement. Okay, thank you.  All right, I think— And I don't know if I reserved time— You didn't reserve any time. 30 seconds just to make one quick clarification. All right, because I'm such a nice person, I'll give you 30 seconds, and don't get on my last nerve. Thank you very much. I really appreciate that, Your Honor. So just one quick clarification. The post-judgment settlement agreement that was entered into between Brentwood and the plaintiffs included terms for a new lease that Judge Carter reviewed, found acceptable, and preliminarily approved. So I just want to clarify that Judge Carter was not of the opinion that it would be impossible for Brentwood School to have a lease that would comply with the Leasing Act. He did approve preliminarily of that settlement agreement that included a new lease. All right, thank you. Thank you. All right, thank you, everyone, for your very helpful arguments today. We appreciate that. And court will be in recess until tomorrow at 9 a.m. Thank you. All rise.  This court for this session stands adjourned.
judges: CALLAHAN, DESAI, ALBA